Jay Ziegler, Petitioner, Philippine Nat'l Bank Philippine Supreme Court, a decision holding that the Republic is the owner and entitled to those funds to the exclusion of the estate of Ferdinand Marcos and its heirs who were the judgment debtors in the district court case below. PNB contended in the district court and contends in this court that the district court had no such authority as a matter of law for three independent reasons. First, the September 2003 orders of the district court by which PNB is put in jeopardy and in which the OSC is based are void under the Act of State Doctrine because they are based on the conclusion of the district court that the Philippine Supreme Court decision and related acts of the Philippine government leading to the recovery of those assets are in effect invalid and can be disregarded. Also, to find PNB in contempt for violating the permanent injunction which was part of the original judgment in this case would also be prohibited by the Act of State Doctrine because it would also require the district court to disregard the Philippine Supreme Court decision. Second, as a matter of law, Philippine National Bank, which is not a party to the case and is not named in any injunctive order, can't be liable as an aider and a better for violating that permanent injunction which is the only valid injunction order in this case which prohibited the Marcos estate and its heirs from transferring any of their assets. The assets transferred by the bank to the Republic early this year were not transferred by, to, or for the benefit or at the instance of the Marcos estate, who are the only parties enjoined. Moreover, they were not assets of the Marcos estate at all but were owned at that time solely by the Republic of the Philippines as determined by the Philippine Supreme Court in litigation in the Philippines in which the Marcos estate was the Republic's adversary. You're assuming that a decision of the court is an act of state. Usually when we're dealing with acts of state, we're dealing with some sort of an executive action or, in other words, the arm that normally conducts foreign policy. I understand that the real parties in interest make that argument. We don't think that that is a reason for not applying the Act of State Doctrine in this ground for at least a couple of reasons. First of all, I don't think there is any rule that the Act of State Doctrine cannot be applied to judicial actions. The usual enunciation of the rule is that it applies to any official act of a foreign sovereign performed within its territory. And it should be undisputed that the judicial branch of the Philippine government, particularly its supreme court, is a co-equal branch with its executive and legislative branch, and that a decision of the Philippine supreme court is an official act of the Philippine government. But beyond that, even if the race is outside the country, I mean, the problem is that the act of the court purports to adjudicate rights in a race that is not before it at the time, that it doesn't have jurisdiction over, I guess would be the best way to describe it. Okay. The race were the funds that were in the custody of PNB as escrow holder. PNB is a Philippine-based bank. It entered into an escrow agreement with the Presidential Commission on Good Government, which is an agency of the executive branch of the Philippines. The funds were then transferred to Singapore. Is that it? From Switzerland? Right. No, that's not exactly correct. What happened, and I believe this is borne out by the record, is that there were proceedings in Switzerland initiated by the republic, pursuant to executive orders that led to freeze orders in Switzerland, subsequent proceedings which led to a transfer pursuant to the federal supreme court of Switzerland that the assets be delivered to PNB as escrow holder pending a final resolution of the Philippine forfeiture proceedings, which were already then ongoing. There are references. I think that's described in one of the decisions in the record. I guess I couldn't find the actual Swiss document in the excerpts. Maybe it's somewhere in the record. I'm not sure if it's in the record in our case. I know it's in the record in the related appeal by the Philippine court itself. There's a Philippine appeal, as you know, that is running somewhat parallel with our writ petition, and there's, as part of that excerpt, the federal supreme court decision of Switzerland. Getting back to Your Honor's earlier question regarding the location of the funds, I believe it is true that after Philippine National Bank obtained control of the funds in the Philippines, it made a decision to deposit some or all of the funds in accounts in its name in Singapore. However, that doesn't mean that the situs of the funds was not still in the Philippines. In fact, the Sandigan Bayon, which is the trial court level in the Philippines, the anti-corruption court which ultimately tried the case or issued a summary judgment, issued an order in 1998, shortly after Philippine National Bank was given custody of the funds, that those funds were within the exclusive custody of the Sandigan Bayon itself. So the fact that Philippine National Bank may have opened accounts in its name in other countries, I don't think means that the situs of the funds was not still based in the Philippines and under the control of the Philippines. And then I take it some of the funds have actually been transferred to the Republic. Is that right, in January or February? Correct. What happened was, chronologically, PNB got the funds in 1998. The Sandigan Bayon proceedings were ongoing at that time. Ultimately, the Philippine supreme court got the case and in July of 2003 issued its opinion, stating, holding that the funds which were on deposit at PNB, which were held by PNB, were awarded to the Republic of the Philippines. There was a subsequent motion for reconsideration made by the Marcoses, which was heard directly by the Philippines supreme court. That court heard the reconsideration petition, decided to deny reconsideration or reconsidered it and held that the decision was correct. And then a writ of execution was issued after the case was returned to the Sandigan Bayon. The writ of execution by the Sandigan Bayon was delivered to a Philippine sheriff, which was then served on Philippine National Bank in the Philippines. That occurred, I think, in early January of this year. In response to the Philippine supreme court decision, the reconsideration decision and the writ of execution, PNB then delivered the funds to the Republic of the Philippines prior to the issuance of the OSC, but subsequent to the issuance of the September 2003 orders by the district court, which were engendered by the Philippine supreme court. So it took about six months between the time the Philippine supreme court issued its first decision in July to January of this year when the bank turned the funds over to the Republic. One other point regarding the locus or situs of the funds, this Court, in dealing with intangible property like bank deposits, has followed a more pragmatic approach rather than trying to determine exactly where an intangible asset may be located. In the Takakish, I think I'm pronouncing it correctly, versus Rockwell International case, this Court said rather than trying to find out where the funds can be determined to be located, when we're looking at the act-of-state doctrine, we'll look at the purposes behind the doctrine and decide whether if we, if the district court or whatever court is considering the Foreign Sovereigns Act, if it declares that act invalid, is that likely to give offense to the sovereign state or cause potential interference with diplomatic efforts by the American executive branch. Here, I think it's pretty clear that the forfeiture of the funds to the government of the Philippines has serious political, economic, and social consequences for the Republic. These are assets that the executive branch has been attempting to secure for probably 14 years. It began with executive orders by the Philippine President Aquino after Marcos was overthrown that established the PCGG and gave it its mandate to attempt to locate and retrieve both within the Philippines and in foreign countries assets stolen by Marcos and his family and cronies while he was in office. Those executive orders resulted in the PCGG. It resulted in the Sandigan Bayan being given original jurisdiction and resulted in the PCGG instituting this forfeiture proceeding that has been ongoing for a number of years. Also, the motion for reconsideration decision of the Philippine Supreme Court, which I mentioned, which was issued in November of this year, specifically addresses the district court's September orders and specifically rejects them outrightly saying that these are offensive to our sovereignty, it's in violation of international law. So there's – there seems to be no doubt that the act of State doctrine is implicated under the ticoctus test because if the Supreme Court decision is not given full effect, that the Philippine government has already expressed its outrage and insult at this having happened. The – Does our earlier decision in the related case bear on your argument at all? I don't think so. The other case involves a different asset. That case involves a Panamanian corporation called Arelma, which is alleged to be a Marcos Alter Ego front corporation. Arelma held a securities account at Merrill Lynch in New York for a number of years and was discovered, I guess, at some time in the 90s and resulted in some series of court proceedings that led to Merrill Lynch filing an interpleader before Judge Reel, the same district judge, is handling MDL 840. But that case involves that specific race, a securities account that was held. I guess what I was thinking of was the mandamus that was earlier issued. The Credit Suisse. Credit Suisse. Oh, and Credit Suisse. That definitely is implicated here. That did involve the same assets and virtually an identical situation in Credit Suisse. The same plaintiffs in this case in MDL 840 through one of their class representatives had filed an action, again, before the same district court judge, seeking an injunction preventing the Swiss banks, which then held these same funds from transferring the funds, without coming to the district court and explaining why they should be able to do that. That's essentially what this order to show cause to P&B says. We know you have these funds or have these funds. You've got to come to me before you get permission to transfer them. The Swiss banks were faced with a complaint as opposed to an order to show cause, but essentially the relief was the same. They took the position that the Swiss freeze orders and the decision of the Federal Supreme Court of Switzerland affirming those were acts of state, which would be held invalid if the claim of the plaintiff in that case were recognized. That came up in the context of a motion to dismiss the complaint, which was denied. They sought writ relief. The order denying the motion to dismiss obviously wouldn't be appealable. They sought writ relief because they were also faced with discovery from the plaintiff seeking information, seeking information regarding these assets and what accounts they were held, who had them, a variety of other details, as I understand it. And that was the basis for their irreparable damage claim that led to this Court granting writ review and ultimately deciding on the merits that the action would be violative of the state doctrine. So it's essentially the same procedurally, other than that that came up in the context of a separate lawsuit as opposed to an order to show cause, also related to the same type of relief.  I don't believe that it has an effect on your claim today. I mean, is there any involvement left of the Swiss government? Okay. I understand your question. Now, that goes to our third point, which we're contending that the mandate of this court in Credit Suisse divested this court of any authority to do what it's doing in connection with the P&B order to show cause. And we believe that the mandate in Credit Suisse would prevent the action that the district court has taken because in that court, in that case, the court said that the district court should refrain from taking any further action in that case or in any other case involving any or all of the real parties in interest and any assets of the estate of Ferdinand Marcos held or claimed to be held by the Swiss banks. There's really three parts to that. Well, the part that the district court focused on was held by the Swiss banks. And he said, well, these aren't any longer held by the Swiss banks. Exactly. I think the other parts of the mandate would apply here. The question is, should the mandate be interpreted to apply after the funds have left the Swiss banks and now are in the hands of Philippine National Bank? And we contend that they should for several reasons, which we've briefed. I think one of the most important ones, though, is that the funds that were transferred by the Swiss banks to Philippine National Bank were as a result of the same official proceedings in Switzerland in which the freeze orders were issued and then remained in the possession of PNB subject to disposition by the Philippine courts as contemplated by the Swiss orders. So it seemed clear, at least to us, that the purpose of the Credit Suisse mandate was to prevent the district court from taking any further action to restrain the transfer or disposition of those assets while they were the subject of legal proceedings between the Republic and the Marcos estate. The Swiss proceedings were also legal proceedings between the Republic and the Marcos estate. They then ended up continuing through the freeze orders and the transfer of the funds in the Philippines. If you don't have any more questions, I'm going to reserve a little time for rebuttal. Thank you. Thank you very much. I'd like to have 14 of the 20 minutes, and I'll be followed by Mr. Edlund after that. Good morning. My name is Robert Swift. I'm counsel for the plaintiffs in the underlying Marcos case, some 9,539 human rights victims, people who were tortured, summarily executed, or disappeared during the Marcos regime. This case has been alive for 18 years. Nine of those years were spent in pursuing the judgment, which is some $2 billion. The last nine years have been spent pursuing execution upon the judgment to try to compensate the human rights victims. To date, nothing has been transmitted to those people for various reasons, some of which are reflected in the decisions of this court. That our inability to proceed against certain Marcos assets, despite our knowledge of where they are, and because, frankly, of the involvement of the Philippine government in trying to prevent its people from recovering on the judgment. This is a microcosm of some of the disputes that have existed over the last several years. Judge Reel, in this post-judgment time period, has been vigilant in trying to enforce the permanent injunction that was affirmed in this court. This proceeding arises out of that. And I guess the beginning of this is with Judge Reel's orders of September 2 of 3, which ultimately led to an order to show cause. But at its base, this is a discovery dispute. That is the nature of the matter before this court at this juncture. Well, before we get to the discovery dispute, the discovery dispute is based upon action in furtherance of the district court's September 2003 orders. And, Mr. Swift, could you tell me why, based on our prior decision in Credit Suisse and I'm looking at the language at the very end of that opinion, beginning at page 1348 of 130 Fed 3rd, when the district court issued its September 2003 order, it was not violating the directive that our prior panel gave, which says, further directing the district court to refrain from taking any further action in the Rosales action or in any other case involving any or all of the real parties in interest in any assets of the estate of Ferdinand Marcos held or claimed to be held by the banks? Well, I would refer, Your Honor, to the last word, the banks. There's a capital B on banks. And earlier in the decision, the word banks is in italics, and it's to indicate that it only refers to those two banks. But that's identifying where the assets were located at the time that our panel issued the opinion. As I read that, that doesn't restrict the effectiveness of that mandate to the banks. It limits the district court to issuing orders regarding that race, which happened to be held by the bank. Now, are you telling me that the judge real just misinterpreted our order? Is that it? Well, perhaps all of us misinterpreted the order. But I did make a motion to clarify that order, and the court did clarify it. We've submitted that. And I think it's very clear that the court was referring simply to the assets that were in the Swiss banks at that time. But aren't these the same assets, only now they're in Singapore instead of Switzerland? No. The assets have grown. There is more than what was in the Swiss banks. That's for one. And second by virtue of interest and so on over the passage of time. That's correct. And secondly, it's important. So the principle is the same. The principle is the same. All right. And the principle, of course, is in Singapore. But remember that the decision in Credit Suisse was predicated upon the act-of-state doctrine. That was the central focus. A transfer of assets doesn't take with it the act-of-state of the Swiss government. The Swiss government is not involved in this proceeding. But that's not my question. My question is why can't I read that language and conclude that Judge Reel should never have issued the orders in September of 2003 because it directly violates what we told him not to do? I guess I fundamentally disagree with you that your order was of that breadth. And I don't believe reading it that I could reach that conclusion. So the best answer, I mean, I understand your answer. And obviously if we disagree with your position, then I guess we issue our ruling accordingly. Well, if you think the order is of that breadth, then perhaps I should retire from pursuing the assets and trying to recover money for these people. I don't believe that this court in Credit Suisse says, Swift, stop executing on any money that the Philippine government is claiming is forfeiture money. That was not the nature of that decision. That decision said we don't want Judge Reel to be treading upon the order of the Swiss Executive Council. That order is now defunct. It's extinguished. There is no freeze order with regard to these assets. What you have now are, in effect, two competing judgments, one that has recently been issued by the Philippine Supreme Court and an older one, the one in the human rights case, which we are vigorously trying to execute upon. Also, the nature of the action in Credit Suisse was very different. There we were seeking an injunction, an injunction against the banks, as well as a declaratory judgment. That is not the nature of what Judge Reel ordered on September 2nd of 2003. It's very different. And at this point, it's a discovery dispute where – And by the way, although Judge Reel's order refers to the Swiss banks in there, they were never served because I read this Court's decision as not allowing that, so I never served them with Judge Reel's order. I did, however, serve the banks in Singapore and Philippine National Bank with the order because they are the ones that currently have the assets that is of interest to the district court. It's our contention that Judge Reel was acting within his authority in issuing those orders, and he examined the decision of the Philippine Supreme Court and frankly found it wanting in due process for a number of reasons, some of which are articulated in his decision. But as counsel in the case, I have pursued the order to show clause and simply hailed Philippine National Bank, which is subject to the personal jurisdiction of the district court because of its office in Hawaii as well as other places, to have them come in and explain the basis as to why they transferred the assets, despite the injunction that exists, the permanent injunction in the district court. And that's the nature of our position in this. Let me see. I think it's clear in the record to answer a question raised by Judge Canby that the assets are in Singapore and although this wasn't in the reproduced record, Exhibit 10 at the March 22nd, 2004 hearing, there is a list of the assets and where they're located. I don't think there's any merit to the argument that, oh, the assets were in the Philippines. They never were. They never reached there. And Exhibit 10 shows entirely to the contrary. They may not be there now. I don't know what. Well, that's the problem. Philippine National Bank refuses to disclose that. And they say that to do so would violate the criminal laws of the Philippines. We've submitted an expert affidavit under Rule 44.1 in the district court by a past president of the Philippine Bar Association saying, no, we do discoveries to that all the time in the Philippines as to judgment. So I don't think there's any merit to if their executive comes into court and testifies as to the location of the assets, where they are, what's been sent, what hasn't, that there's likely to be any criminal prosecution. There has never been a criminal prosecution under the banking laws in the Philippines, which makes them classic blocking statutes. One of the maybe because you served in one of the banks in Singapore just kept the money and started an interpreter in Singapore. One bank. Yes, that's correct. And that and that proceeding is ongoing. How much was involved in that? A small portion of that. A small portion, $22 million. And the Singapore courts are adjudicating that during the past several months and it will take several more months, I expect. Unless the panel has other questions, I will reserve the rest of the time for Mr. Edlin. I think not. Thank you, Mr. Swift. May it please the Court, Phil Edlin. I appear on behalf of the Marcos Interest. And I think a question from Judge Tallman followed by Judge Canby, which opposing counsel answered, is really critical to this, and it shows that we do have here, and what this Court is faced with is an extraordinary request for mandamus on a discovery issue, and it's a factual issue. And the question, I think, was something about, well, the funds have been transferred from Singapore to the Philippines, to the Republic. And Your Honor, as a follow-up, aren't there some still there? We don't know that. And the record in this case does not show that. Counsel responded to the question that the writ from the Philippine Supreme Court, which was dated January 22nd, the writ was served in early January. The record does not show that. And the record is what we're looking at here. And it's very important because the district courts ordered to show cause was February 25th. These dates are significant. The record does not state that the bank was served on January 22nd. It says only that after the writ was served, the bank, quote, delivered the funds. Now, we don't know what that means. When was it actually served? The copy of the writ that is in the record before this Court, and this is the bank's declaration, Exhibit 5, ER 259-261, is dated March 3, nearly six weeks later. And that date is authenticated by the court clerk in the Philippines. There's no copy in this record of any writ showing service of the bank either on January 22nd or on any date. The writ itself requires the sheriff in the Philippines to submit his return to the court. That's ER 260. There is no return in this record. There's nothing in this record to show at any time when the bank was served with a writ or when it, quote, delivered the funds. Indeed, we don't know what delivery of the funds means. And recall again the judge's order to show cause was February 22nd. Now, why is this significant? Well, it shows some very careful, artful drafting of declarations and exhibits. It does not show in any way that the bank was served with a writ or that the bank, quote, delivered. Now, what does delivered mean? It could be just a book entry on something. Those funds, we strongly believe, are still in the Singapore banks. And what was the district judge trying to do here? He was trying to maintain the status quo. He was not trying to aggressively go out and do anything. He was trying to maintain the status quo because there's a judgment which this court said to the district court in the Credit Suisse case when it clarified its judgment, said, we want you to keep doing your job under Rule 23, and we want you to keep doing your job in attempting to resolve this controversy. So what the judge was doing here was exactly what this court has told the judge he should be doing. One of the things the judge did was reinstate the settlement agreement. I'm sorry, Your Honor. One of the things the district court did was, purported to do at least, was to reinstate the settlement agreement. Well, yeah, there's language that is strongly of that view. I do not think that absent a further hearing that the settlement agreement itself could be reinstated. But there was evidence taken at the March hearing where the attorney for the president of the Philippines and the Republic of the Philippines appeared and testified as to the agreement that was made by the Republic of the Philippines, by the president, by the Marcoses, by the plaintiffs, with the bank there participating in it. And that was an agreement which, with that testimony that was presented to the district court in March of this year, which we hadn't had before, by the attorney who had the authority from the Republic of the Philippines to make an agreement and settle this controversy, the judge was saying, and I think a further evidentiary hearing with some additional discovery may permit the judge to reinstate that settlement. But it was a little premature at this time. What the bank is asking this court to do at the present time is simply indulge in assumptions that we think are quite extraordinary. The bank is asking this court to say, well, look, if we have this discovery, the judge may overrule our objections. Speculation. And the judge will find us in contempt. Speculation. And the court, the district court will not issue an interlocutory appeal. Speculation. And the bank says the district court has been consistently in error. That's not what this court of appeals has said about what this district court has done. And I think I would like to make one final point, because the only real leg, the only real predicate for the argument that there is this terrible dilemma facing the bank, that there's a terrible choice between what might happen if this discovery takes place and is the bank secrecy law of the Philippines. But I want to note particularly in their closing brief, the bank said the Philippine bank secrecy law objection at the trial court is irrelevant, irrelevant to this writ petition or its stay order. And that's in their response at page 4. That is the only leg that they've got to ask this court to exercise its extraordinary power of mandamus and stop discovery that may lead to preserving the status quo or at least preventing further kinds of dating of writs and dating of declarations. Thanks very much, Your Honor. Thank you, Mr. Edlund. I'll just respond briefly to some of the points that real parties made. First of all, I think we should make it clear that the judgment in favor of the real parties, Mr. Swift's clients, is not a competing judgment with the judgment in the Philippines for forfeiture of the assets. The judgment of Mr. Swift's client is a money judgment based on a tort claim. It wasn't a money judgment that even entitled them to any specific property to satisfy the judgment. It's simply a money judgment. It's competing in the sense that his clients are claiming that this was an asset of the Marcos estate, and the Philippine government is saying, no, it belongs to the Philippines. So it's pretty important to the estate or to the plaintiffs to resolve the question of who owns the funds. Did they participate in the Philippine litigation? I assume not. They did not. We submit the question has been decided. The question was litigated for many years between the Marcos estate and the Republic of the Philippines through the PCGG as to whether these funds were the Marcos estate funds or were forfeited to the Republic. That question has been decided, and courts in the United States must recognize that decision, and so must the plaintiffs. There was much made about this being a discovery dispute. We disagree with that. All the issues that we raised in the district court that are before this Court are issues of law. Development of any further factual record is unnecessary. The predicates for the discovery that they seek are the September 2003 orders and the order to show cause, which we say are invalid ab initio. It doesn't matter what the discovery would show. So it's for that reason that you refuse to produce your declarant from the bank? Well, the reason that we are objecting to any further discovery beyond the declaration we provided were the Philippine bank secrecy laws. First of all, we don't think it's necessary to do discovery. We don't think it's relevant because these are issues of law. The OSC is based on the allegation of the plaintiff that the funds have been transferred to the Republic of the Philippines. The September 2003 order is based on the premise that the Philippine Supreme Court decision is unlawful. All we're saying is there is a Philippine Supreme Court decision. We transferred the assets pursuant to that decision. The question of the timing is irrelevant. The question of the location of the assets is irrelevant, except possibly they've said to the active state doctrine question. But we've said the location is in the Philippines because of the situs of the parties and the order of the Sandigan Bayan, and because the court doesn't necessarily have to determine a physical situs when applying the doctrine under the Takakish doctrine. So discovery as to when the assets were in Singapore, when they left Singapore, and so forth really isn't necessary. And in our responsive brief, the point we made about the Philippine bank secrecy objection is not that it's not relevant, but the merits of it is not relevant to this writ petition. The objection is relevant because it puts our client in the dilemma of being faced with the possibility of either having to violate Swiss criminal laws on bank secrecy, or if they don't violate the Philippine laws, excuse me, I said Swiss, the Philippine laws, if they don't violate the Philippine laws being held in contempt by the district court for refusing to provide the discovery on that ground, our point is this court doesn't have to reach the question of whether that objection would be sustained or not. The objection has been asserted in good faith. It's certainly colorable. We think it's completely meritorious, and that's the basis for the irreparable harm that we face. On the credit Swiss mandate, the comment about the clarifying order I don't think adds anything to their position. The clarifying order denied a motion to modify the opinion. It just said that the district court could engage in settlement activities, but it used the same qualifying language, provided the district court does not take any further action in this case or in any other case with respect to those assets. And we contend that what this Court was referring to were the assets, not to the Swiss banks. As you said, at that time they were with the Swiss banks. They subsequently were with the Philippine bank. Thank you. Well, before you sit down, the point your opponents were making is that the reason for that mandate was to protect the integrity of an order of the Swiss government. It was at that time, but as I said. So even though it maybe is identifying the funds, the reason for that protection no longer exists. But as I said, that Swiss proceeding was initiated by the Republic of the Philippines. It asked for that order. Pursuant to that order, those very same funds were transferred from Switzerland to the Philippines to the custody of Philippine National Bank for it to hold pending a final determination of this forfeiture proceeding. So it's one continuous, although international, proceeding initiated by the Republic  of the Philippines.  Thank you. I think I understand your argument. You've referred to a package. What was the case that you. I don't know that it's in your brief, is it? Yes. Okay. If it's in the reply brief, I just looked in the original brief. If it's in the reply. It's in the reply brief to contract versus. Okay. I won't need this citation then. That's fine. All right. Thank you. Thank you both. Counsel. The case just argued is submitted and we will stand adjourned until tomorrow morning. Okay.
judges: Goodwin, Canby Tallman